Good afternoon. We are here for argument on Baz v. Patterson 23-3407. Mr. Schaefer-Goddard, whenever you're ready. May it please the court, my name is Jonathan Schaefer-Goddard and I appear on behalf of Respondent Appellant Mr. Patterson. As this circuit has recognized, the Hague Abduction Convention is fundamentally an anti-abduction statute, an international effort to deal with the vexing problem of child custody when more than one country is involved. It is an anti-forum shopping convention. It operates by returning the child to the forum presumptively best suited to resolve the custody dispute. But when that forum, when the forum in which the party's custody dispute is to be determined has already been decided by the parties, as the case here, and has been fixed in the state where the petition is brought, as is the case here, then there is no role left for the convention. But let me question an assumption that you just made in this statement. That assumption is whether it is up to the parties to designate a particular forum. I know you rely very heavily in your briefing on the stipulation that the parties have. But as you well know, stipulations don't bind people who are not part of the agreement. The stipulation was between the two parents, the mother and the father. The stipulation did not include the child, number one, and the stipulation did not include the court, most importantly. And there are lots of cases that say stipulations can't bind third parties, particularly the court. So I distinguish between the stipulation as to habitual residence. What I'm focusing on here is the exclusive jurisdiction agreement. But I'm not sure that under the Supreme Court's precedence that that is for the parties to stipulate. We also have a fairly long line of authority saying that parties can't stipulate to jurisdiction. It's not a stipulation to jurisdiction. The court in question, the circuit court of Cook County, Illinois, had jurisdiction, had exercised it over the parties, over the child, since very shortly after the child was born. No, I understand that the circuit court of Cook County, of course, has jurisdiction over domestic relations matters. But we're talking, as you stressed, about the convention. And the question that I see is whether the Hague Convention allows the parties to make this fundamental decision about habitual residence, which is what the authority of the court to this is a private ordering subject. So I want to focus on the exclusive jurisdiction agreement, which is to do with custody rather than the Hague Convention. And those are very distinct concepts. Of course, they're quite different. Now, because the parties have agreed where custody will be resolved, that amounts, in our submission, to a waiver of the right of return under the Hague Convention. But I've never seen a case waive—the whole point of the Hague Convention, as I read Minosky, the parties could stipulate to a jurisdiction that's not the child's habitual residence, could stipulate to a jurisdiction that wasn't in the best interest of the child. I mean, I read Minosky as saying that it is up for the court to evaluate all of the factors. They say multiple times, a totality of the circumstances test. If the Hague Convention applies, then it's absolutely the case that you have reached the question of habitual residence, and I'm happy to address the court on that. In my submission, because there is an exclusive jurisdiction agreement, in the allocation judgment, the consent order from the county of Illinois, the court endorsed this. We don't reach that point. Have you a case where somebody has—oh, excuse me, David, did you want to say something? If I could join the thought here in this debate, which is obviously critical to this case. Both you and counsel for the mother, in essence, offer rather absolute positions regarding the weight of the Illinois allocation judgment. You, in essence, argue it's conclusive, which I find hard to square with Minosky. The mother seems to argue we shouldn't pay any attention to it at all, or should give it no weight at all, which suggests that the father was foolish to agree to the terms of that apparently sensible, comprehensive agreement. And I'm wondering if you might be able to offer some middle ground about the weight that stipulations about habitual residence and agreements to jurisdiction should play in later aid convention disputes. Thank you, Your Honor. To take the second part of that first, if I may, the exclusive jurisdiction part, and I'll return to habitual residence. Courts across the United States, the Ninth Circuit, the First Circuit, the Fifth Circuit, and this is also the view of the United States in an amicus brief cited and agreed with by the Ninth Circuit in Holder, have said that the parties may waive the right to return and may agree to litigate custody in a place other than the habitual residence. If that is the case, there can be no clearer example of that than an agreement to litigate in a particular place made to conclude a custody proceeding and affirmed in a court order. That is a quintessential waiver. You have the cases in the reply brief. It's Holder in the Ninth Circuit, which cites the U.S. amicus brief. It's Nicholson in the First Circuit. That is overt commentary, but absolutely on point here. But counsel, I took a look at those cases before today, and those seem to deal with the concept of waiver as in at the time the removal happens, right? And so parent A is in the country with a child. Parent B comes, takes the child, moves the child to a different country. And the parent A kind of acquiesces in some way, says, gives consent, or says that's fine. Or in that way, it's an affirmative defense under the hate convention that one party acquiesces or agrees, right? But that's not really, that's a bit different from what we have here. So let me give you a hypothetical, for example. Let's say that two parents enter into stipulation, much like we have here, in year one. And they know, and they decide that, you know what, the parent A will take the child and they will live in another country indefinitely, okay? And they agree in year one that the country that they're at, they stipulate, will be the habitual residence of the child. Let's say 15 years goes by, 16 years, 17 years goes by, okay? The child doesn't have any familiarity with anything in the first country, right? The child's life is rooted in the new country. And you're telling us that in that fact scenario, that under the laws that you've cited, that the hate convention, that we should disregard Monaskey and the analysis that Monaskey asks us to do in favor of that stipulation that the parties entered into 16 years before the dispute arises. That would be the logical extension of your argument, would it not? I don't think it needs to go that far. No, no, but I'm saying, in my hypothetical, would you take the position that in my hypothetical, that the stipulation that the parents entered into when the child was one years old should control where the child's habitual residence is in year 17? Not automatically, Your Honor. The reason for that is, I'll speak in generalities and then in reference to this case. There are ways to relieve a party of a stipulation such that it no longer binds them. The parties have both referred to the Waldorf case and the factors there for relieving parties from stipulations. The allocation judgment itself clearly provides a method for altering it and Illinois law does the same. But what if the parties, and by altering you mean going back and getting another order or if there's an express agreement, what if there is no express agreement or meeting of the minds in those 16 years between the parties, right? Yeah. And so the parties just go ahead and go on with their lives and in year 17, all of a sudden, the parent A files a suit to have the child returned via the hate convention. They would be able to resort immediately to the Waldorf test to relieve them from a stipulation that, in the interest of justice, should no longer be binding. But at any point prior, if there's not been a meeting of minds, as in my submission Dr. Baird should have done, they can go to the court, enter that order, and in our case it's the circuit court of Cook County, Illinois, and seek to have the stipulation changed. But that means the stipulation is binding on the court. And I'll just read you some language from a case called United States against Barnes, happens to have been in the sentencing area, where we said in 2010, generally stipulations are not binding on the fact finder. A stipulation is a contract between two parties to agree that a certain fact is true. As such, standard contract principles apply. A contract between the prosecutor and the defendant cannot bind the third party, the district judge, without his consent as well. There are lots of other cases that say things like that. So I guess I'm having trouble understanding why when the court gets this Hague Convention petition, and it is charged under the Hague Convention, with determining which court will be the deciding body for all of these questions that are arising in this relationship, I don't see how the court's hands can be tied by something that the parties inter se have done. The court under Manaske has the responsibility, using perhaps as a very powerful factor, the agreement between the parties. It's not irrelevant at all. It belongs in the equation, but I don't see why it ties the hands of the court. So I take your point, Your Honor, and I might come back on my rebuttal time in relation to Barnes and a fact stipulation. But in relation to an exclusive jurisdiction agreement, courts respect exclusive jurisdiction agreements all the time. It's perfectly normal to bind parties to litigate in the forum which they've agreed to litigate. Well, that's right. It has to be the kind of case that is subject, though, to a choice of forum clause. And as you well know, they're fine in private law matters. You can have contracts, you can have joint ventures, you can have distribution agreements, you can have all sorts of things where there are choice of forum clauses. This doesn't strike me as a private law matter. I agree custody is going to be different from a joint distribution agreement, of course, Your Honor. But there's a reason this agreement has been made. And Your Honor, Judge Hamilton, you referred to this in your question. There's a reason that this agreement was entered. There's a reason this language is here. And if you read the section with the habitual residence fact stipulation and the exclusive jurisdiction clause, it forms a coherent scheme designed to ensure that the court which has looked after the interests of the child in this case since they were one month old will continue to do so. If that no longer worked for Dr. Bass, she should have gone to the court in Illinois and asked for a change. Instead, she went to the courts in Germany, sought a travel ban, and sought sole custody. I'm not sure she did seek sole custody originally. It was Mr. Patterson who got the sole custody order in Illinois unrequested, as I recall. I can give you the site from the appendix shortly. I know I'm in my rebuttal time here. But Dr. Bass sought a travel ban on the 20th of January and then sought sole custody in Germany. And that is still pending on the 20th of February, 2023. Right, yeah. Okay, that's fine. Could I ask you, with the indulgence of my colleagues, and we may have some flexibility on the timing here. If, as I understand it, after the German consent order was entered in May of 2023, the father went back to Illinois and filed a translation of that order with the Illinois court. Is it also correct that he was claiming that he entered into that under duress? My understanding is that that is what he said to the guardian ad litem. Ah, okay. But, I mean, the German consent order didn't resolve very much at all. That's right. And can I ask you to address, and I hope that counsel for the mother will address this issue as well, and that is what we make of the mother's, when she made that petition in February 20th of 2023, she certainly seemed to indicate that the reason she had told the Illinois court and the guardian ad litem that she was trying to establish a right to get to the United States permanently was only because she otherwise thought she was going to lose the case. Is that? Yes, you're right. It's in black and white in the affidavit. And I'm concerned about several aspects of this case. One is by the district court's conclusion that going to the Illinois court or any court for that matter would be treated as a wrongful act under the Hague Convention as equivalent to abducting a child. But in particular if we're going to get into any debates in which going to court can be treated as wrongful, I'm concerned about that, both that original representation that she intended to go to Germany only temporarily and also by the effort that she made to get sole custody in February of 2023 in the German courts. If I can address you briefly on those, Your Honor, I'm aware of the time. You can go ahead. We'll give you some more rebuttal time. I appreciate that. Thank you. It is quite clear from the affidavit that was filed in the German courts when Dr. Baz sought sole custody that she made the representations about trying to return to Illinois not because they were true but because she thought that's what she needed to say to keep her son with her. That's what she says to the German courts. And it in my submission you see this in my opening brief quite clearly suggests that the original removal in the summer of 2023 when the court allowed her to go to Germany was procured under false pretenses. And you see the Illinois court clearly concerned about that in the way it frames the July 25th order where it notes that she has misled the court that she's not being served. Excuse me. You just said in 2023. I think you're referring to 2022 aren't you? I'm referring to the July 2023 order of the Illinois court which is a few minutes ago you were referring to the original removal the original removal in May 22 your honor yes. Thank you. Okay. Okay. Thank you. Even if the court is not satisfied that that is a wrongful removal it is quite clear on the district court's own reasoning and the admitted facts that by going to the German courts she wrongfully retained their son. Indeed Mr. Passon was not able to exercise his visitation over spring break in April 2023 that he was meant to because a travel ban had been put in place and she would not allow a visit. To be clear what we have here is a situation where having promised the Illinois court that she will deal with custody before it that the original residence of her son is the United States of America she then when a few months have passed goes to the German courts and she accepted in her testimony her own words that she did that because she didn't want to be in two jurisdictions. Thank you counsel. I'll give you two minutes in rebuttal. Thank you Your Honor. Thank you. Mr. Holfmeyer. May it please the court. Good afternoon. My name is Sam Holfmeyer and I represent Petitioner Dr.  in this appeal. We recognize that the underlying facts of this case are difficult and emotional and they involve difficult topics like domestic violence. But the court's role here is very narrow. Judge Alonzo issued a careful detailed and considered order in which he correctly weighed after a two-day evidence hearing the full totality of the circumstances of this case regarding the child's life and he determined that the child was at home in Germany when the wrongful retention took place in this case. To overturn this court would have to find one of two things. Either that Judge Alonzo erred as a matter of law by following the Supreme Court's decision in Redmond and finding that parental agreements in Hague Convention cases while relevant are not controlling or that Judge Alonzo clearly erred when considering the totality of the circumstances and the facts in this case. Can we start then maybe with the alleged representation that Dr. Baz made that she was going to try to return to the United States and whether she was trying to mislead the Illinois Court? Yes, Your Honor. And I want to be clear about that. Judge Alonzo considered those allegations. He was the one that was there judging the credibility of Dr. Baz testified in the District Court. Mr. Patterson testified in the District Court. The guardian testified in the District Court. Judge Alonzo was there to resolve this dispute about whether that was improper or not. He considered the testimony of both of those parties and he    Court. I don't have an explicit finding on that point. I would have to look at the order again but he was fully aware that this happened and he simply didn't believe the story. He didn't believe which story. He didn't believe the story that Dr. Baz was the wrong actor in this case. That's the question. That she had misrepresented something to the State Court. To bring it back to what Dr. Baz did in this case, she tried everything to stay in the United States back in May of 22 leading up to that the allocation judgment that the parties entered into. She tried a variety of different visa applications and tried to stay as best as she could in the United States. She hired a lawyer. She tried a U visa, H-1B visa, H-2B visa. Yes, Your Honor. She tried to stay in the United States and there's been no evidence presented that she took any wrongful steps in staying in Germany. In fact, in May of 2023, both parties agreed that she that the child and her could remain in Germany indefinitely in the German consent order. That's the second document that we contend is important. There's the 2022 allocation judgment in the 2023 German consent order and in that order resolved the litigation that was ongoing in both Germany and Illinois or it was supposed to do that. The German consent order was only very interrupted, right? Your Honor, it was not agreed and both parents reaffirmed the Illinois allocation judgment, correct? To the extent it didn't conflict with the German consent order. Yes, that's right, Your Honor. What does that mean? Well, to the German consent order was in a sense interim, but it was also the indefinite belief and it was what the parties intended to continue on into the future and where the child would live. He would live primarily with the mother in Germany indefinitely and the consent order continues what the allocation judgment also said. It carried that and it carried the visitation schedule and I guess what it doesn't have, and we've never seen, is something that said you have a year to work it out in Germany and after that the child comes back to Illinois. Your Honor, the allocation judgment as well, the 2022 allocation judgment is indefinite in nature and there's no term on that. In fact, the provision specifically suggests that it's going to last for a period of years. That's what Judge Alonzo says at page 12. Yes, Your Honor, and if you look at the visitation that the allocation judgment provides, Mr. Patterson, it says he gets visitation and he gets access to the son during the school breaks, but it also says that that will continue for years to come. The same schedule will apply for years to come. So it was very clearly designed, even the allocation judgment, to last a period of several years. There's a provision in the agreement that talks about when the child turns 18. I mean, it was designed to last for an extended period of time. Counsel, I guess to kind of echo one of the concerns that Judge Hamilton mentioned previously is that it seems like we don't want to create a system that discourages parties from trying to come to agreement with regard to custody issues. We want to establish a system that encourages those types of settlements and agreements. One of the concerns I have is that here, the parties on their own, or with the help of the court, entered into the allocation agreement instead of battling it out, which was probably in, I would think, the child's best interest at the time. And so the parties agreed to that, including the habitual residents and the forum provision, whatever legal effect it may have, and then they ordered their lives accordingly. Otherwise, one might reasonably presume that Mr. Patterson would have fought to keep AP here in the United States, and a long drawn-out custody battle would have ensued. Similarly, when the parties entered into the German consent order, one would think that if someone had told Mr. Patterson, you know what, if you sign this, that means that AP will be in Germany for as long as Ms. Bas and AP wants. He might have some concerns about that, but for the fact that, at least to himself, he thinks, oh, you know, we agreed to the habitual residence before, and so I'm okay with signing this agreement. So, I guess the question that I have in my mind, and maybe along the lines of what Judge Hamilton asked, is what weight then are we supposed to give these private orderings, these private agreements in our analysis, even under Minaski? And how are we to think about them when it comes to cases like this? Yes, Your Honor, and I wanted to respond to Judge Hamilton's    important to think  weight. I don't believe that the parental agreement in this case, weight. Minaski specifically says that. It says parental intent, like all other factors, is entitled to some weight.  I don't  that the parental intent    weight. I don't believe that parental intent is entitled to some weight. I don't believe that parental intent is     don't     is  to some weight. I don't I don't believe that parental intent is entitled to some weight. I don't believe that parental intent is intended to some     that parental intent is except for some weight on. I don't believe that parental intent is  to some weight on the child. I don't believe that parental intent is intended to some weight on believe that parental intent  intended to some weight